IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

NICHOLAS NAPOLITANO,
     Petitioner,

vs.                          Case No.:  3:15cv456/LAC/EMT

SECRETARY, FLORIDA DEPARTMENT
OF CORRECTIONS,
     Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 10).  Petitioner filed a reply (ECF No. 15).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the

opinion of the undersigned that the pleadings and attachments before the court show

that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established

by the state court record (*see* ECF No. 10).[1]   Petitioner was charged in the Circuit

Court in and for Escambia County, Florida, Case No. 2009-CF-5923, with three

counts of sexual battery (slight force) (Counts 1, 2, and 3), and three counts of incest

(Counts 4, 5, and 6) (Ex. A at 3).   On July 7, 2010, Petitioner and the State entered a

written agreement, pursuant to which Petitioner agreed to plead nolo contendere to

Counts 4, 5, and 6, and the State agreed to dismiss Counts 1, 2, and 3 (*id.* at 164–67).

There was no agreement as to Petitioner's sentence (*see id.*).   On July 15, 2010, the

trial court adjudicated Petitioner guilty of the three incest counts and sentenced

Petitioner to three consecutive terms of four (4) years in prison, with pre-sentence jail

credit of 212 days on Count 4 (Ex. B).   Petitioner, through counsel, appealed the

judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D10-

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 10).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

4619, but subsequently voluntarily dismissed the appeal (Ex. B at 273, Ex. D). The First DCA dismissed the appeal on February 8, 2011 (Ex. D).

On April 8, 2011, Petitioner filed a counseled motion for reduction of sentence, pursuant to Rule 3.800(c) of the Florida Rules of Criminal Procedure (Ex. E). The court denied the motion in an order rendered April 19, 2011 (*id.*).

On February 1, 2012, Petitioner filed a counseled motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. F at 43–55). Petitioner filed an amended motion (*id.* at 60–72) and a second amended motion (*id.* at 73–86). The state circuit court entered an order striking the motion as facially insufficient, without prejudice to Petitioner's filing a facially sufficient motion "within a reasonable time" (*id.* at 87–88). Petitioner filed a third amended Rule 3.850 motion on November 6, 2012 (*id.* at 89–103). The circuit court ordered a limited evidentiary hearing (*id.* at 143–44), and evidentiary proceedings were held on July 19, 2013, and April 15, 2014 (Ex. F at 154–96, Ex. G at 230–05). The circuit court denied the Rule 3.850 motion in an order rendered June 9, 2014 (Ex. G at 338–43). Petitioner appealed the decision to the First DCA, Case No. 1D14-3021 (Ex. I). The First DCA affirmed the decision per curiam without written opinion on August 19,

2015, with the mandate issuing October 15, 2015 (Ex. N).  Napolitano v. State, 174

So. 3d 999 (Fla. 1st DCA 2015) (Table).

Petitioner, through counsel, filed the instant federal habeas action on October

19, 2015 (ECF No. 1).

II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an

application for a writ of habeas corpus in behalf of a person in custody pursuant to the

judgment of a State court" upon a showing that his custody is in violation of the

Constitution or laws of the United States.  As the instant petition was filed after April

24, 1996, it is subject to the more deferential standard for habeas review of state court

decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death

Penalty Act of 1996 (AEDPA).  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19.  In

relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the merits in
> State court proceedings unless the adjudication of the claim–
> > (1)  resulted in a decision that was contrary to, or involved
> > an unreasonable application of, clearly established Federal law, as
> > determined by the Supreme Court of the United States; or
> > (2)    resulted in a decision that was based on an
> > unreasonable determination of the facts in light of the evidence
> > presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2] The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Id.</u>, 529 U.S. at 412–13 (O'Connor, J., concurring); <u>Ramdass v. Angelone</u>, 530 U.S. 156, 120 S. Ct. 2113, 147 L. Ed. 2d 125 (2000). In employing this test, the Supreme

---

[2] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). "Clearly established Federal law, includes only the holdings, as opposed to the dicta, of the Supreme Court's decisions." Woods v. Donald, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) (citation omitted).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of

the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim. However, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. See Woods, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants: "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's

decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).  The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  *See* Gill, *supra* at 1291 (citing Richter).  Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.

*See* <u>Richter</u>, 562 U.S. at 102; *see also* <u>Gill</u>, *supra,* at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the

presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see, e.g.,* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* Gill, 633 F.3d at 1292. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied § 2254(d) does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless

the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

## III.    PETITIONER'S CLAIMS

A.    Ground One:  "Petitioner Napolitano's no contest plea was involuntary and/or defense counsel rendered ineffective assistance of counsel by advising Petitioner Napolitano that he would not be given a prison sentence."

Petitioner contends that his no contest plea was involuntary and/or defense counsel rendered ineffective assistance of counsel ("IAC") by advising him that he would not be given a prison sentence if he entered the plea (ECF No. 1 at 10–14). Petitioner alleges that prior to entering the no contest plea, defense counsel told him that the state trial court would not impose a prison sentence (i.e., defense counsel told Petitioner Napolitano that the State was dropping the sexual battery charges and the trial court would not send Petitioner Napolitano to prison for the incest charges, meaning that Petitioner Napolitano would be going home).  Petitioner asserts that contrary to defense counsel's statement, the trial court sentenced him to twelve years in prison.  Petitioner contends that either his plea was involuntary and/or defense counsel rendered ineffective assistance by advising him that he would not be given a prison sentence.  Petitioner argues that as a result, he was denied his right to make a

knowing and voluntary decision regarding his plea, in violation of the Fifth Amendment, and he was denied his right to effective assistance of counsel, in violation of the Sixth Amendment.  Petitioner asserts that but for defense counsel's erroneous statement as to the sentence that would be imposed, Petitioner would not have entered a no contest plea and would have proceeded to trial.

Respondent contends that Petitioner has not shown that the post-conviction court's factual findings were clearly and convincingly unreasonable, or that the state court's adjudication of the claim was contrary to or an unreasonable application of clearly established federal law (ECF No. 10 at 5–14).  Therefore, Petitioner is not entitled to relief on Ground One.

### 1.    Clearly Established Federal Law

A defendant's Sixth Amendment right to counsel extends to the plea-bargaining process.  Lafler v. Cooper, — U.S. —, 132 S. Ct. 1376, 1384, 182 L. Ed. 2d 398 (2012) (citing Missouri v. Frye, — U.S. —, 132 S. Ct. 1399, 1404, — L. Ed. 2d — (2012), and McMann v. Richardson, 397 U.S. 759, 771, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970)).  "If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it."  Lafler, 132 S. Ct. at 1387. The two-part test articulated in Strickland v. Washington, 466 U.S. 668 (1984) applies

to claims that counsel was ineffective during the plea process.  <u>Lafler</u>, 132 S. Ct. at

1384 (applying <u>Strickland</u>'s two-part test to federal habeas petitioner's claim that

counsel was ineffective for advising him to reject a plea offer); <u>Frye</u>, 132 S. Ct. at

1404, 1409–10 (applying <u>Strickland</u>'s two-part test to federal habeas petitioner's

claim that counsel was ineffective for failing to communicate a prosecution plea offer

before it lapsed); <u>Hill v. Lockhart</u>, 474 U.S. 52, 48, 106 S. Ct. 366, 88 L. Ed. 2d 203

(1985) (applying <u>Strickland</u>'s two-part test to defendant's challenge to his guilty plea

based on ineffective assistance of counsel).

Strickland's first prong requires a defendant to show "'that counsel's

representation fell below an objective standard of reasonableness.'"  <u>Hill</u>, 474 U.S. at

57 (quoting <u>Strickland</u>, 466 U.S. at 688).  The focus of inquiry under the performance

prong of the <u>Strickland</u> standard is whether counsel's assistance was "reasonable

considering all the circumstances."  <u>Strickland</u>, 466 U.S. at 691. The Supreme Court

warned about second-guessing professional judgments made by counsel:

> [T]he decision to plead guilty before the evidence is in frequently
> involves the making of difficult judgments.  All the pertinent facts
> normally cannot be known unless witnesses are examined and
> cross-examined in court.  Even then the truth will often be in dispute.  In
> the face of unavoidable uncertainty, the defendant and his counsel must
> make their best judgment as to the weight of the State's case.  Counsel
> must predict how the facts, as he understands them, would be viewed by
> a court . . . .  Questions like these cannot be answered with certitude; yet

> a decision to plead guilty must necessarily rest upon counsel's answers, uncertain as they may be. Waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts. That a guilty plea must be intelligently made is not a requirement that all advice offered by the defendant's lawyer withstand retrospective examination in a post-conviction hearing.

McMann, 397 U.S. at 769–70.

In a plea situation, counsel must provide advice "within the range of competence demanded of attorneys in criminal cases." Hill, 474 U.S. at 56–57 (quoting McMann, 397 U.S. at 771). Under this standard, representation is ineffective only if counsel commits "serious derelictions" of his duty when advising the accused. Stano v. Dugger, 921 F.2d 1125, 1150–51 (11th Cir. 1991). Absent such blatant errors, however, the court should "indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance." Yordan v. Dugger, 909 F.2d 474, 477 (11th Cir. 1990). The Eleventh Circuit has commented that "[t]he right to competent plea bargain advice is at best a privilege that confers no certain benefit," because a defendant "may make a wise decision" without assistance of counsel or a "bad one despite superior advice from his lawyer." Wofford v. Wainwright, 748 F.2d 1505, 1508 (11th Cir. 1984) (per curiam). "[C]ounsel owes a lesser duty to a client who pleads guilty than to one who decides to go to trial, and in

the former case counsel need only provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between [entering a plea] and going to trial." *Id.*  This requires counsel to "offer his informed opinion as to the best course to be followed" and impart "a general knowledge of the possible legal consequences of facing trial" to the defendant.  *Id.* Therefore, a defendant's failure to "correctly assess every relevant factor entering into his decision" does not undermine a validly entered guilty plea.  *Id.* at 1509.

Strickland's second prong requires a defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  In the context of pleas, "[t]he . . . 'prejudice' requirement . . . focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." Hill, 474 U.S. at 59.

When a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).  "Surmounting Strickland's high bar is never an

easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d

284 (2010).   "Establishing that a state court's application of <u>Strickland</u> was

unreasonable under § 2254(d) is all the more difficult." <u>Richter</u>, 131 S. Ct. at 788. As

the <u>Richter</u> Court explained:

> The standards created by <u>Strickland</u> and § 2254(d) are both "highly
> deferential," and when the two apply in tandem, review is "doubly" so.
> The <u>Strickland</u> standard is a general one, so the range of reasonable
> applications is substantial.  Federal habeas courts must guard against the
> danger of equating unreasonableness under <u>Strickland</u> with
> unreasonableness under § 2254(d).   When § 2254(d) applies, the
> question is not whether counsel's actions were reasonable.  The question
> is whether there is any reasonable argument that counsel satisfied
> <u>Strickland</u>'s deferential standard.

*Id.* (citations omitted).

### 2.   Federal Review of State Court Decision

Petitioner raised this IAC claim as Ground 2 of his Rule 3.850 motion (Ex. F

at 96–97).  In the state circuit court's written decision denying the claim, the court

correctly stated the deficient performance and prejudice prongs of the <u>Strickland</u>

standard as the applicable legal standard (Ex. G at 338–39).  The court adjudicated the

claim as follows:

> **Ground 2**—Defendant . . . alleges his attorney erred by telling
> him he would not be sentenced to prison if he entered a plea.  Defendant

appeared before the Court and entered a plea to three counts of incest on July 7, 2010.[FN 3:  Plea hearing, pages 1–17, attached as Exhibit B.] The written agreement noted that, in exchange for the plea, the sexual battery charges against Defendant would be dropped.[FN 4:  Exhibit C.]

Before accepting the plea, the Court informed Defendant he could receive a maximum sentence of 15 years in prison if the sentences were ordered to run consecutive.  The Court then explained that, if it accepted the State's version of the scoresheet, the lowest permissible prison sentence would actually be in excess of 15 years.  Defendant said he understood the potential sentence and was entering the plea voluntarily.

The Court accepted the plea and sentenced Defendant to prison for four years on each count, consecutive, for a total sentence of 12 years. According to the motion, Defendant claims his attorney told him that the Court would not impose a prison sentence if he entered a plea.  Because Defendant believed he would not be sentenced to prison, Defendant argues, the plea was entered involuntarily.

At Defendant's evidentiary hearing, attorney James Barnes testified he had represented Defendant when he was initially charged with the sexual battery of his niece.  Mr. Barnes said that, because there was evidence suggesting that the victim had consented to sex with Defendant, the State offered to drop the sexual battery charges and accept a plea to three counts of incest.  Mr. Barnes said he could not recall discussing what sentence Defendant could expect to receive if he entered a plea to the Court.  He did, however, say it was his practice never to guarantee a specific sentence or suggest that prison was not a possibility to a client.

Mr. Barnes was then presented with a letter he was alleged to have written to Defendant before sentencing, but after the plea had been entered.  In the letter, dated July 12, 2010, Mr. Barnes explained he was preparing a memorandum for a downward departure sentence.  The letter ended by informing Defendant "you're going home."   Mr. Barnes

testified the part of the letter that stated "you're going home" was not his handwriting.

Defendant testified Mr. Barnes gave him the letter before sentencing and promised him he would not be sentenced to prison.  Had he known that prison was a possibility, Defendant said, he would have gone to trial.  Defendant testified he had recently found the letter after cleaning out his locker while in prison.  Defendant said that, after finding the letter, he gave it to his attorney "about two weeks" before the evidentiary hearing.  Defendant said he did not write the disputed portion of the letter.  The evidentiary hearing was then continued and later reset for April 15, 2014.

When the hearing resumed, Defendant called Connie Childs to testify and give her expert opinion on the letter allegedly written by Mr. Barnes.  Ms. Childs said she had been certified as a "forensic document examiner" by the International School of Forensic Document Examination in Sherman Oaks, California.  Ms. Childs said she had taken online classes and "proficiency testing" in order to become certified.  Ms. Childs was allowed to testify as an expert and give her opinion on the letter allegedly written by Mr. Barnes.  Ms. Childs said she had reviewed the letter and compared it to samples of Mr. Barnes' handwriting.  Ms. Childs testified that, in her opinion, the letter was written by Mr. Barnes.

The State's expert, Karen Nobles, testified she had also reviewed the letter to determine its authenticity.  Ms. Nobles said she had worked for the Florida Department of Law Enforcement since 1989 as a document analyst and had testified in court on numerous occasions as an expert.  Ms. Nobles stated she had examined the letter and compared it to samples of Mr. Barnes' handwriting.  Ms. Nobles said that, in her opinion, the phrase "you're going home" appeared to have been the result of "simulation or tracing."  When Ms. Nobles examined the document under ultraviolet light, she said she was able to determine the phrase "you're going home" had been written in a different type of ink than the rest of the letter.

Although unable to say who had written the letter, Ms. Nobles said the phrase at issue was "written very slowly and contains all the characteristics that would indicate that the person who wrote it simulated the handwriting that is at the top portion of the letter to make them look the same."

Having considered all of the evidence, the Court finds Defendant was not misadvised with respect to the consequences of his plea.  The record shows Defendant was specifically informed by the Court that he was facing a prison sentence of 15 years if he admitted to committing three counts of incest.  The Court also accepts Mr. Barnes' testimony that he would not have advised a client who entered a plea that prison was not a possibility.

Finally, the Court accepts the testimony of Ms. Nobles and her opinion that the portion of the letter stating "you're going home" was an attempted simulation.  Ms. Nobles, an expert with significant experience in document analysis, stated the phrase was written in different ink than the rest of the letter and appeared to be the result of tracing.  In light of her testimony, the Court finds the letter is not credible evidence supporting Defendant's claim that he was misadvised by Mr. Barnes.  Since Defendant was aware that he could be sentenced to prison at the time he entered the plea, he was not misadvised by counsel and this claim is denied.

(Ex. G at 339–42).  Petitioner argued this issue on appeal to the First DCA (Ex. I).

The appellate court affirmed the lower court's decision in a one-word per curiam

affirmance (Ex. L).

Petitioner contends that this federal court should review his habeas claims de

novo, because the First DCA did not issue a written opinion (*see* ECF No. 1 at 7).

Relying on <u>Shelton v. Sec'y, Dep't of Corr.</u>, 802 F. Supp. 2d 1289, 1297 (M.D. Fla.

2011), Petitioner argues that the First DCA's per curiam affirmance did not constitute an adjudication of the merits of his post-conviction claims; therefore, no deference is due to the state court's decision (*id.* at 7–8).

Respondent contends the Eleventh Circuit rejected the district court's conclusion in <u>Shelton</u> when it reversed the district court's decision.  <u>Shelton</u>, 691 F.3d at 1353–54 (11th Cir. 2012).

Petitioner's contention that the First DCA did not adjudicate the merits of his claim is without merit.  Section § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been "adjudicated on the merits."  *See* <u>Richter</u>, 562 U.S. at 99.  When a state court issues an order that summarily rejects without discussion all the claims raised by a defendant, including a federal claim that the defendant subsequently presses in a federal habeas proceeding, the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits in the absence of any indication or state-law procedural principles to the contrary.  *Id.*  The presumption may be overcome when there is a reason to think some other explanation for the state court's decision is more likely.  *Id.* at 99–100.

Here, the First DCA did not apply a procedural bar.  Further, Petitioner has not rebutted the presumption that the First DCA adjudicated the merits of his claim.

Therefore, § 2254(d) applies to the First DCA's decision.  *See* <u>Richter</u>, 562 U.S. at 100; *see also* <u>Shelton</u>, 691 F.3d at 1353 (where state appellate court did not apply a procedural bar, the federal habeas court is compelled to presume that the court's one-word per curiam affirmance was an "adjudication on the merits" entitled to AEDPA deference).

Petitioner next argues that the state court's decision as to Ground One was based upon an unreasonable determination of the facts.  Petitioner specifically argues that the court overlooked an e-mail that defense counsel, Attorney James Barnes, sent to Margaret Hautman on June 9, 2010, in which Barnes stated, "There is a good chance the judge will just give him time-served."  Petitioner contends this e-mail is consistent with the language in the handwritten note from Attorney Barnes to Petitioner, dated July 12, 2010, which included the phrase, "You're going home." Petitioner argues that this evidence, along with Petitioner's testimony at the evidentiary hearing, clearly and convincingly demonstrates that Attorney Barnes told Petitioner that if he accepted the State's plea offer to drop the sexual battery charges, the trial court would not impose a prison sentence on the remaining incest charges.

According to the transcript of the plea hearing held on July 7, 2010 (the day after a jury had been selected for Petitioner's trial on all six counts), Attorney Barnes

announced to the court that the State had offered to drop the three sexual battery

counts in exchange for Petitioner's no contest plea to the three incest counts (*see* Ex.

C at 287–303).  The prosecutor confirmed on the record that Attorney Barnes had

shared newly discovered evidence (text messages between the victim and Petitioner)

which materially changed the State's position on the sexual battery counts, and

prompted the State to offer to drop those counts in exchange for Petitioner's plea to

the incest counts.  As previously noted, the parties presented the court with the written

plea agreement, which provided that Petitioner would plead no contest to the three

incest charges in exchange for the State's dismissing the three sexual battery charges.

The parties made no agreement as to Petitioner's sentence (*see* Ex. C; Ex. A at

164–67).  The written plea agreement expressly stated that each of the three incest

charges carried a maximum sentence of 5 years in state prison (Ex. A at 164).

       After placing Petitioner under oath, the trial court conducted the following

colloquy:

> THE COURT:  And Mr. Napolitano, I have a written plea agreement dated today.  It has what appears to be your signature.  Is that your signature, sir?
>
> THE DEFENDANT:  Yes.
>
> THE COURT:  And prior to signing this, did you read it?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Did you understand it?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Did you go over it with your attorney?

THE DEFENDANT:  Yes, I did.

THE COURT:  Did he satisfactorily explain the terms and conditions of the written plea to you?

THE DEFENDANT:  Yes, he did.

THE COURT:  Do you have any questions concerning it this afternoon?

THE DEFENDANT:  None.

THE COURT:  Are you satisfied you've had sufficient time to discuss the case and any theories of defense to the charge with your attorney?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Are you satisfied with the services of Mr. Barnes, your attorney?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Has anybody forced, coerced, or threatened you to enter this plea today?

THE DEFENDANT:  No.

THE COURT:  Have you had any drugs or alcohol within the last 24 hours?

THE DEFENDANT:  No.

THE COURT:  So what you're telling me is you're entering this plea freely and voluntarily of your own will?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Sir, do you understand that this is what's referred to as a straight up plea to Counts 4, 5 and 6, and each of those counts charge one count of incest.  Each count carries a maximum penalty of five years state prison, $5,000 fine, or both for a total of 45 years state prison.  Do you understand that?

THE DEFENDANT:  Yes, Your Honor.

MR. BARNES:  Fifteen.

THE COURT:  I'm sorry.  Fifteen years.  I was looking at the first three counts.

Each of these are [sic] a third degree felony.  It carries a maximum penalty of five years state prison, $5,000 fine, or both.  But, they can run consecutive, which would be a total of 15 years state prison.  Do you understand that, sir?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you also understand on straight up pleas, sir, that the Court is free to impose any legal sentence?  Do you understand that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  In other words, you could be sentenced to a period of five years state prison on each of these counts to run consecutive for a total of 15 years.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  In the event—I don't have—I know there's a dispute over the guidelines.

MR. ROBINSON [the prosecutor]:  Judge, as it is, if the Court uses the 80 points, the total would be 185.55 months, which would actually be 15 years, plus five and a half months; 15 years is 180 months.

THE COURT:  Right.

MR. ROBINSON:  If that's what you may be looking at.

THE COURT:  What the attorney is saying, sir, is if the Court accepts these, this score sheet, in other words, accesses the points for penetration, the actual sentence, the lowest permissible prison sentence would actually be 185.55 months state prison.

And, unless there was some reason for the Court to depart downward from that, that would be the lowest permissible prison sentence that the Court could impose.  Do you understand that?

THE DEFENDANT:  Yes, Your Honor.

. . . .

THE COURT:  And you believe it's in your best interest to enter your plea?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Now, sir, you understand we've already picked a jury.  There's a jury scheduled to come in in the morning to afford you

a trial on this, on these charges.  But if you enter a plea this morning, or this afternoon, then of course there will be no trial?

    THE DEFENDANT:  I understand that, sir.

    THE COURT:  Do you also understand that you're waiving your right to appeal the judgment of the Court; in other words, the guilt, innocence portion of the Court, but you always reserve the right to appeal the legality of the sentence of the Court?

    THE DEFENDANT:  Yes, Your Honor.

    THE COURT:  And you still want to go forward with your plea?

    THE DEFENDANT:  Yes, Your Honor.

. . . .

    THE COURT:  All right.  The Court is going to find that the plea of nolo contendere or no contest to Counts 4, 5 and 6, each count charging incest, is freely, voluntarily, intelligently entered after the defendant had the benefit of advice of counsel.  The Court will accept the plea.

(Ex. C at 296–300).

After the plea hearing and prior to sentencing, Attorney Barnes filed a Motion for Downward Departure and a Notice of Objection to Addition of Victim Injury Points (Ex. B at 207–60).  At the sentencing hearing on July 15, 2010, Attorney Barnes objected to the assessment of 240 sentencing points, in the "Victim Injury" section of the sentencing scoresheet, assessed for sexual penetration, and Barnes argued for a downward departure sentence (Ex. B).  The court agreed with defense

counsel's argument, which reduced Petitioner's total sentence points from 266.4 to 26.4, which meant that the lowest permissible sentence was a non-state prison sanction (*id.* at 175–86, 202–05).  Additionally, Attorney Barnes argued for mitigation of Petitioner's sentence, on the ground that the "victim" consented to a sexual relationship with Petitioner (*id.* at 186–87).  The court sentenced Petitioner to four years in state prison on each count, to run consecutively (*id.* at 199).

Turning to the post-conviction proceedings, Attorney Barnes testified as follows at the evidentiary hearing when questioned about Petitioner's allegation that he assured him that he would not serve any time if he entered a plea:

> Q [by the State].  Okay.  He's alleged that you assured him that there will be no jail time involved.  Do you recall having such a discussion with him?
>
> A.  No.  Unfortunately, I don't.  I haven't done practice [sic] for all these years.  You know, I had a case even before Mr. Napolitano, it was a first offense we went to trial on and my client got jail.  The point being, you can get jail on a first-offense misdemeanor case so there's no guarantee that you're not gonna get jail unless, of course, that's part of the plea agreement so it would be like me speaking Chinese to say to someone you're not going to get jail time.
>
> Q.  Okay.  So what you're telling us, then, although you have no apparent, independent recollection that it is your practice not to advise clients who score jail time or prison time that they don't have to worry about going to prison?

A.  No.  And to the contrary, I would say, we still have to worry about going to prison.  We can argue for a downward departure perhaps, but no, if you're in the prison range, it's a strong likelihood, you're gonna go to prison.  I had, I think, one successful downward departure, maybe two in my whole time.

Q.  All right.  And—

THE COURT:  For the record, I want to be sure that we're all talking about the same thing.  Originally, the points were 266.4, but apparently, Judge Rasmussen annotated the file—Yeah.  Those are his initials—reduced it to 26.4 is what the file indicates.

THE WITNESS:  If he scored prison, I would've said, we're likely to get prison.  If he scored under prison, I would have said it is up in the air.

Q. (By Mr. Ridlehoover) Well, as you may recall—Do you recall who the judge was on this case?

A.  Judge Rasmussen.  And he had a particular—he had a pension [sic] for lack of a better word to bring the hammer down on sex cases. You know, I was you fight [sic] and you fight and you fight, and then when you win the fight, you're happy so I was pleased but we were still in the crosshairs.  If the points were under prison, I still would have said, there's a chance you're still gonna go to prison and he had Judge Rasmussen so there was even more of a chance than it was perhaps some other judge because Judge Rasmussen had a pension [sic] for sex cases.

(Ex. F at 160–62).  Attorney Barnes testified that prior to entry of Petitioner's plea, the two of them discussed that Petitioner would still face the possibility of prison time even if Barnes successfully argued for a reduction in the sentencing points assessed for sexual penetration (Ex. F at 160).

On cross-examination, Petitioner's post-conviction counsel showed Attorney Barnes handwritten notes from Barnes' office file in Petitioner's case (Defense Exhibit 1), and Barnes identified the notes as written by him (Ex. F at 164–65).  Post-conviction counsel admitted the notes into evidence solely for the purpose of providing a sample of Attorney Barnes' handwriting (*id.* at 165, 197).  Post-conviction counsel then showed Attorney Barnes a note (Defense Exhibit 2), and asked Barnes to read it on the record:

> A [by Attorney Barnes].  It says "'Nick."  It's dated 7/12.  "Sorry, no time to visit and no word yet on what the research shows.  I will meet with my paralegal team tomorrow or Wednesday and come see you.  I'm also working on a sentencing memorandum motion for downward departure.  You're going home."  Well, the "you're going home" isn't my writing, I can tell you that.  "Keep the faith."  It just doesn't look like my writing.

(Ex. F at 164).

During Petitioner's testimony, he identified Defense Exhibit 2 as a letter written by Attorney Barnes on July 12, 2010 (Ex. F at 167–76).  Petitioner testified that Barnes had told him he would visit him at the jail on July 12, 2010.  Petitioner testified that he saw Attorney Barnes enter the jail dormitory while he was on the telephone with his fiancee, Margaret (Hautman).  Petitioner testified that Attorney Barnes looked at him and held up his finger, indicating that he would talk to him in

a minute, and then Barnes visited several other inmates.  Petitioner testified that he saw Attorney Barnes go to the correctional officer's booth and write a note on a piece of yellow paper.  Petitioner testified that he saw Barnes fold the note and give it to the officer, and then the officer gave the note to him (Petitioner).  Petitioner testified that he re-discovered the note while cleaning his prison locker 3 ½ years after he was sentenced (*id.* at 175–76).  He testified that he did not alter the note (*id.*).  The court admitted Defense Exhibit 2 into evidence over the State's objection (*id.* at 176).

Petitioner also testified that prior to entry of his plea, Attorney Barnes unequivocally told him that he was "going home":

> Q  [by Petitioner's post-conviction counsel].   [W]hat did Mr. Barnes tell you about what was gonna happen to you after you entered the plea and after you were sentenced?
>
> A.  I was going home.
>
> Q.  He told you [that] you were going home?
>
> A.  Going home.  That was his words; going home.  I mean—
>
> Q.  Did he tell that his best guess was, you're going home but he wasn't sure?
>
> A.  No.  He said, "you're going home."
>
> Q.  Did he tell you, he thinks you might be going home but you never can be sure with a judge?

A.  No, sir.  He said, "you're going home."

Q.  And that's what he told you prior to the time you entered the plea?

A.  Yes.

Q.  After you entered the plea, did you continue to tell you that you were going home?

A.  Yes, he did.

(Ex. F at 173).  Petitioner testified that Attorney Barnes did not qualify his statement: "It was no [sic] might, maybe.  It was definitely, you're going home.  It's over with. You're going in [sic].  That's it.  It's done" (*id.* at 175).  Petitioner testified that he entered the plea because Attorney Barnes told him that he would be going home (*id.* at 174–75).  Petitioner testified that he definitely would not have entered a plea if Attorney Barnes had told him that he would probably go to prison (*id.*).

At the continued evidentiary hearing, on April 15, 2014, Petitioner presented testimony from Connie Childs, a forensic document examiner (Ex. G at 235–55).  Ms. Childs testified that she received her training from the International School of Forensic Document Examination in 2011, which involved two years of online studies, teleconferencing tests, proficiency testing, and two years of mentorship.  Ms. Childs testified that she had not been certified as a handwriting expert in any other

jurisdiction.  She testified that she had previously testified as a handwriting expert in a case in the State of Georgia.  Ms. Childs testified that she was a member of the American College of Forensic Examiners Institute, and had a membership application pending with the National Association of Document Examiners.  She testified that she had rendered opinions in over 85 cases, but had worked on only 25 cases since she became certified.  Ms. Childs testified that she used a light box, a stereo microscope, a protractor, a metric rule, a computer, a scanner, a printer, and Power Point 8 software to analyze the documents in Petitioner's case.  Ms. Childs testified that she examined the <u>original</u> handwritten note dated 7/12 (Defense Exhibit 2) with only a microscope, but she used the other equipment to compare a <u>certified</u> <u>copy</u> of the note with five documents she selected from the fourteen documents provided to her from Attorney Barnes' file (Defense Exhibit 1 (Ex. G at 320–37)).  Ms. Childs testified that in her professional expert opinion, the handwriting in all of the documents that she examined was genuine, and the author of the "known document" (the documents from Attorney Barnes' file) was the author of the "questioned document" (the handwritten note dated 7/12 which included the phrase "you're going home").  Ms. Childs testified that on a scale of one to nine, her opinion was "at number one, the definite indication, the highest degree of confidence in my opinion that the handwriting belongs to the

same identifying party" (Ex. G at 252). Ms. Childs testified that her opinion would not change even if it were established that the phrase "you're going home" was written with different ink than the rest of the 7/12 note. On cross-examination, Ms. Childs admitted that she picked the five "comparison" letters from Attorney Barnes' file because they had the most obvious and significant similarities to the handwritten note dated 7/12 (Ex. G at 254).

Petitioner also presented testimony from Margaret Hautman (Ex. G at 258–60). Ms. Hautman identified Defense Exhibit 3 as a copy of an e-mail she had received from Attorney Barnes on June 9, 2010. Ms. Hautman read a portion of the e-mail into the record:

> "Slow down. I intend Nick to be found not guilty for the sexual battery. We have a very good case. As for the incest, if Nick's niece and he had sex with her [sic], is he guilty of incest? Simply stated, he is. It will be up to the judge to sentence him and I will point out that she is not being charged which is unfair and it was consensual assuming he is found not guilty which I expect him to be. There is a good chance the judge will just give him time-served."

(Ex. G at 260).

The State presented testimony from Karen Nobles, an examiner in the Questioned Document Section of the Florida Department of Law Enforcement ("FDLE") since 1989 (Ex. G at 268–87). Ms. Nobles testified that she trained for two

years in the Escambia County Sheriff's Department, then attended the FBI school for

questioned document examiners and the Secret Service school for questioned

document examiners.  Ms. Nobles testified that in 1986, she was evaluated by the

forensic document examiner of the Alabama Department of Forensic Science, who

determined that she was qualified to render opinions.  Ms. Nobles testified that she

was certified by the FDLE and also by the American Society of Questioned Document

Examiners (*id.* at 284).  Ms. Nobles testified that she had previously testified in the

federal courts for the Northern and Southern Districts of Florida, the state courts in

Florida and Alabama, military hearings, and administrative hearings.  Ms. Nobles

testified that she originally compared a <u>photocopy</u> of the handwritten note dated 7/12

with known handwriting standard of James Barnes, and determined that with regard

to the phrase "You're going home," there was slowness of writing indicative of

unnatural or "not genuine" writing.  She testified that she therefore contacted counsel

for the State and requested the original handwritten note.  She testified as follows with

regard to her analysis of the <u>original</u> handwritten note:

> When I got the original document, I put it under the microscope
> and there were quite a number of places where, for example, on the
> bottom of the lower case Y there was just a little stroke or tick added to
> it and then the last line the "You're going home" was very heavy,
> slowness of execution, some patching, some overwriting, all the things
> that are indicative of simulation or tracing.  So at that point, I began to

suspect that it was a simulation, that someone had looked at the top part of the letter and said okay, this was how this person makes a Y and I'm going to make the Y like that and had written it very slowly. Because when you write naturally you write normally pretty quickly. There is tapering, beginning and ending strokes. There are pen lifts in particular places where they should be. There is no patching in the middle. There is no tremor. All of those things that are present in a normal and natural handwriting were not present.

So because of that suspicion then I put it under a video spectral comparator which is really a very expensive piece of equipment is that [sic] what it does simply allows you to view the inks with specific spectrum or nanometers of light so I could look at the ink under the infrared spectrum, I could look at it under ultraviolet and with infrared luminescence. And if there is a significant ink difference in the components that make up the ink then that will show there. If they all reacted the same, I could not say that was the same ink. And in order to do that, it has to be chemically broken down. But if they have a distinct different reaction, then I can say they are different because the components in those ink [sic] cause different reactions. Some luminesce, some get darker and some actually disappear in the infrared. So in putting it under the instrument, that is when I began to see all the areas that had been touched or written over with a different pen. There were a number of areas in the top and the bottom portion of the letter and the entire last line "You're going home."

(Ex. G at 273–75). Ms. Nobles identified a series of images she observed under the

video spectral comparator, which were admitted as evidence (State's Exhibit 1), and

described how each image indicated that certain areas of the 7/12 note were

overwritten with a different pen, and that the phrase "You're going home" was

entirely written with different ink (*id.* at 275–76, 306–16). Ms. Nobles testified:

> I can't say who did or did not write it [the phrase "You're going home"].
> I can tell you that it was written with a different ink.  It was written very
> slowly and contains all the characteristics that would indicate that the
> person who wrote it simulated the handwriting that is at the top portion
> of the letter to make them look at the same.

(Ex. G at 278).  Ms. Nobles' report (State's Exhibit 2) was admitted into evidence (*id.*

at 283, 317–18).   On cross-examination, Ms. Nobles testified that she could not

identify the writer of the phrase "You're going home," because it was a simulation;

therefore, she could not say that James Barnes wrote it or did not write it (*id.* at 282).

Upon questioning by the court, Ms. Nobles testified that the American College

of Forensic Examiners (of which Connie Childs was a member) was the subject of a

recent exposé for certifying a person in forensic pathology even though the person had

no medical training (Ex. G at 284).  The court continued its questioning:

> Q.  And last question.  Ms. Childs mentioned a scale of one to
> nine.  Are you familiar with that scale?
>
> A.   Not numerically.   There are conclusions scales that are
> published first by ASTM and now by (inaudible) doc [sic] that show
> levels of conclusion to say identification, probable, indications that it
> was written by, no conclusion and then indications not written, probably
> not written or elimination.  So there are levels that people who adhere to
> that methodology use.  I never used them on a number scale.
>
> Q.  And can you couch your testimony in terms of that scale?
>
> A.  Well, I didn't do a handwriting comparison and I believe that
> she did.  I didn't because it was a simulation of the writing above and

therefore, not identifiable to a person, but I mean, I can tell you I'm 100 percent certain that those are two different inks.

(Ex. G at 287).

Petitioner contends the state court's denial of his IAC claim was based upon an unreasonable determination of the facts. Petitioner argues that the state court unreasonably found Attorney Barnes' testimony credible, when he stated that he would not have advised Petitioner that prison was not a possibility. Petitioner contends this credibility finding was unreasonable because the state court did not mention the language in the June 9, 2010 e-mail from Attorney Barnes to Margaret Hautman, which was consistent with the language in the handwritten note dated 7/12.

"Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011); see also Gore v. Sec'y for Dep't of Corr., 492 F.3d 1273, 1300 (11th Cir. 2007) (noting that while reviewing court also gives a certain amount of deference to credibility determinations, that deference is heightened on habeas review) (citing Rice v. Collins, 546 U.S. 333, 341–42, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) (stating that "[r]easonable minds reviewing the record might disagree about the [witness'] credibility, but on habeas review that does

not suffice to supersede the trial court's credibility determination")).  Federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."  Marshall v. Lonberger, 459 U.S. 422, 434, 103 S. Ct. 843,74 L. Ed. 2d 646 (1983); *see also* Baldwin v. Johnson, 152 F.3d 1304, 1317 (11th Cir. 1998); Smith v. Kemp, 715 F.2d 1459, 1465 (11th Cir. 1983) ("Resolution of conflicts in evidence and credibility issues rests within the province of the state habeas court, provided petitioner has been afforded the opportunity to a full and fair hearing.").  Questions of the credibility and demeanor of a witness are questions of fact.  *See* Consalvo, *supra* (citing Freund v. Butterworth, 165 F.3d 839, 862 (11th Cir. 1999) (en banc)).  As previously discussed, the AEDPA affords a presumption of correctness to a factual determination made by a state court; the habeas petitioner has the burden of overcoming the presumption of correctness by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e).

The June 9, 2010 e-mail does not clearly and convincingly establish that Attorney Barnes unequivocally informed Petitioner that he was going home if he entered a no contest plea to the incest charges, which is what Petitioner is claiming. The e-mail is dated nearly one month prior to the date Petitioner entered his plea.  At the time of the e-mail, Petitioner was proceeding to trial on all six of the charges;

indeed a jury was picked on July 6, 2010, and the trial on all of the charges was to

commence two days later, on the morning of July 8 (*see* Ex. PD-1, docket entry dated

7/6/2010).  At the time of the June 9 e-mail, Attorney Barnes could offer only his

good-faith expectations as to the outcome of the case, and the non-definitive nature

of his evaluation is evident from the language he used in the e-mail:

> "I <u>intend</u> Nick to be found not guilty for the sexual battery.  We have a
> very good case.  As for the incest, <u>if</u> she is Nick's niece [sic] and he had
> sex with her, is he guilty of incest?  Simply stated, he is.  <u>It will be up to</u>
> <u>the judge to sentence him</u> and I will point out that she is not being
> charged (which is unfair) and it was consusual [sic] (<u>assuming</u> he is
> found not guilty—which I <u>expect</u> him to be).  There is a <u>good</u> <u>chance</u> the
> judge will just give him "time served".
> . . . .
> As for Nick not being able to last, worry about that <u>IF</u> he gets time—a
> big <u>IF</u>."

(Ex. G at 319) (underline emphasis added).  The e-mail does not clearly and

convincing establish that Attorney Barnes advised Petitioner that he would go home

if he entered a no contest plea to the incest charges.  Therefore, Petitioner has not

overcome the presumption of correctness afforded to the state court's factual findings

under § 2254(e)(1).

The court thus accepts as fact the following findings of the state court:  (1) prior

to entering his plea, Petitioner was specifically informed by the trial court that he was

facing a prison sentence of 15 years if he admitted to committing three counts of

incest; (2) Attorney Barnes would not have advised Petitioner that prison was not a possibility; (3) the portion of the handwritten noted dated 7/12 stating, "You're going home" was an attempted simulation of Attorney Barnes' handwriting in the rest of the note; and (4) the handwritten note dated 7/12 was not credible evidence supporting Petitioner's claim that he was misadvised by Attorney Barnes.  Based upon these facts, the state court reasonably concluded that Petitioner was not misadvised with respect to his sentence if he entered a plea.

Petitioner failed to demonstrate that the state court's adjudication of Ground One was based upon an unreasonable determination of the facts, or that it was contrary to or an unreasonable application of <u>Strickland</u>.  Therefore, Petitioner is not entitled to federal habeas relief on Ground One.

B.     <u>Ground Two: "Ineffective assistance of counsel for failing to investigate an available defense and for failing to discuss this defense with Petitioner Napolitano prior to the entry of the no contest plea."</u>

Petitioner claims that Attorney Barnes was ineffective for failing to investigate and discuss with him, prior to entry of his no contest plea, an available defense, specifically, whether he and the alleged victim were related by blood, which was an element of the offense of incest (ECF No. 1 at 15–17).  Petitioner contends no reasonable attorney would have failed to investigate the "blood relative" element

when defending against an incest charge.   Petitioner alleges that after he was sentenced, he conducted an independent investigation of the "blood relative" issue by sending DNA data to an independent expert, DNA Diagnostics Center ("DDC"). Petitioner asserts DDC concluded that it is possible that Petitioner and the victim were not biologically related as uncle and niece.   Petitioner alleges he submitted this evidence to the post-conviction court, but the court summarily denied his IAC claim.

Petitioner requests an evidentiary hearing on Ground Two (ECF No. 1 at 17–19).  He argues that the state court denied him the opportunity to present evidence related to this claim; therefore, he was prevented from developing a factual basis for the claim in state court.  Petitioner argues that because he did not receive a full, fair and adequate hearing in the Rule 3.850 proceeding, the state court's factual findings are not entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1).

Respondent contends that even though the state court's order granting an evidentiary hearing was limited to a different ground for relief (the claim asserted in Ground One *supra*), the court took evidence on this claim (Petitioner's testimony) on the second day of the evidentiary hearing (*see* ECF No. 10 at 14–15).  Respondent further argues that under Cullen v. Pinholster, 563 U.S. 170, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011), and Eleventh Circuit opinions interpreting Pinholster, Petitioner

must first satisfy § 2254(d) in order to obtain a federal evidentiary hearing (*id.* at 15–18).

In Pinholster, the Supreme Court held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court."  563 U.S. at 185. "[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review."  *Id.* Pinholster presents "a clear, emphatic rule:  if a state court has adjudicated the claim on the merits, then a petitioner must satisfy § 2254(d)(1) based only on the record before that state court." Pope v. Sec'y, Fla. Dep't of Corr., 752 F.3d 1254, 1263 (11th Cir. 2014), *cert. denied sub nom* Pope v. Jones, 135 S. Ct. 1550, 191 L. Ed. 2d 643 (2015).  Thus, as a general rule, district courts may not expand the record or conduct evidentiary hearings to supplement the existing state court record under 28 U.S.C. § 2254(d).  *See* Frazier v. Bouchard, 661 F.3d 519, 528 (11th Cir. 2011) (limiting review under § 2254(d)(1) to record before state court, and refusing to consider expanded record presented to district court); Moore v. Mitchell, 708 F.3d 760, 780–81 (9th Cir. 2013) (federal habeas court could not consider additional evidence not before state courts, even though parties jointly moved to expand the record); Ballinger v. Prelesnik, 709 F.3d 558, 561 (6th Cir. 2013) (district courts are precluded from

conducting evidentiary hearings to supplement existing state court records when a state court has issued a decision on the merits with respect to the claim at issue); Brown v. Wenerowicz, 663 F.3d 619, 629 (3d Cir. 2011) (finding Pinholster controlling and holding that the district court erred in conducting an evidentiary hearing). Likewise, review of a claim under § 2254(d)(2) is expressly limited to "evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Additionally, although § 2254(e)(2) permits federal habeas courts to take new evidence in an evidentiary hearing, that provision applies only when the petitioner has either satisfied § 2254(d), or the federal court is deciding claims that were not adjudicated on the merits in state court. *See* Pinholster, 563 U.S. at 185–86.

Here, the state circuit court and the First DCA adjudicated Petitioner's federal claim on the merits. Therefore, Petitioner must satisfy § 2254(d) in order for the federal court to even consider whether an evidentiary hearing is permissible; in other words, he must first show that the state courts' adjudication of his claim was contrary to or an unreasonable application of clearly established federal law, or was based upon an unreasonable determination of the facts.

### 1. Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground 1 in his Rule 3.850 motion (Ex. F at

93–96).  The state circuit court adjudicated the claim as follows:

> **Ground 1**—In ground one, Defendant alleges his attorney was
> ineffective for failing to investigate evidence he was not related to the
> victim.  In support of his claim, Defendant writes that DNA analysis
> shows it is "possible" he was not related to the victim.
>
> The State charged Defendant with incest, claiming he was the
> victim's biological uncle.  Defendant has submitted correspondence from
> a DNA analyst who determined the "data are *consistent* with a biological
> relationship of uncle [and] niece."[FN2: Ex. A] (Emphasis added.)  The
> Court finds the analysis referenced in the Defendant's motion does not
> support the claim that trial counsel was ineffective for failing to
> investigate a possible defense.
>
> The results of the DNA analysis, contrary to Defendant's claim,
> actually confirm a biological relationship between Defendant and the
> victim.  Although the letter states it is "possible" that Defendant and
> victim are not related, the speculative nature of the claim is insufficient
> to show prejudice.  Since Defendant's allegation does not establish that
> counsel was ineffective for failure to investigate, this claim is denied.

(Ex. G at 339).  Petitioner argued this issue on appeal to the First DCA (Ex. I).  The

appellate court affirmed the lower court's decision without written opinion (Ex. L).

The letter from DDC, dated November 17, 2011, is part of the state court record

(Ex. F at 102–03).  The letter states the following:

> This correspondence is related to my review of the report of DNA
> analysis conducted by Trinity DNA Solutions of Milton, FL regarding

of [sic] N. Napolitano and K. Napolitano.  The testing was preformed [sic] to determine whether N. Napolitano and K. Napolitano are biologically related and uncle and niece.

Testing in this case was conducted by Trinity DNA Solutions. This laboratory is not currently accredited by the AABB (www.aabb.org), the organization that has developed standards for relationship testing laboratories and accredits relationship testing laboratories.  AABB accreditation is viewed as the premier accreditation for relationship testing.

The testing performed by Trinity DNA Solutions involved STR analysis of 15 loci (locations in the DNA) that are standard in relationship testing.  Two individuals related as uncle and niece will share on average 25% of their DNA due to the biological relationship. Formulae have been developed to determine the significance of any DNA alleles (genetic markers) that match.  Using the data generated by Trinity DNA Solutions, I performed calculations using the DNA-View program, a computer program commonly used in relationship testing, and obtained results consistent with those reported by Trinity DNA Solutions.

Relationship testing of this type produces a likelihood ratio that is the genetic odds in favor of the relationship.  Trinity DNA Solutions reported a likelihood ratio of 6 (4.51 by my calculations using a Caucasian population) which means it is 6 times more likely that N. Napolitano and K. Napolitano are related as uncle and niece versus unrelated.   The likelihood ratio was converted to a probability of relatedness as uncle and niece of 86.98% (81.85% by my calculations) using Bayes Theorem.   The data are consistent with a biological relationship of uncle niece.

DNA analysis to evaluate relationships like an uncle and niece can never exclude the proposed relationship, like DNA testing can do for a first-degree biological relationship like parent child.  Although, the test results by Trinity DNA Solutions are consistent that N. Napolitano and

K. Napolitano are related as uncle and niece, it is possible that they are
not related as uncle and niece and that the likelihood ratio of 6 is due to
the sharing of alleles common in the population.

(Ex. F at 102–03).

The state court record demonstrates that Petitioner knew, prior to entry of his

no contest plea, that even though he considered the victim to be his niece, he did not

actually know whether she was his biological niece, and he had reason to believe that

she was not biologically related to him.  At a pre-trial bond hearing on March 30,

2010, three months prior to entry of his no contest plea, Petitioner testified that he

previously served twelve years in prison for killing his brother, who was the victim's

alleged father (Ex. A at 78).  Petitioner testified:

> Q [by the prosecutor].  Isn't it true that the brother your testified
> [sic] to killing is actually the victim in this case, Kristin, it's her father,
> correct?
>
> A.  We don't know.
>
> Q.  Well, as far as you know, as far as it's been told?
>
> A.  I have another niece besides her, Danielle, she ain't my niece.
> She has a different father, but she's still my niece.
>
> Q.  Okay.  Is the victim in this case Kristin Napolitano your niece
> as far as you know?
>
> A.  I consider them both my niece, yes.

Q.  Okay.  Her father, who she knew to be her father was your brother, correct?

A.  Yes, it was, my youngest brother.

(*see* Ex. A at 87–88).

Turning to the Rule 3.850 proceeding, Petitioner testified at the post-conviction evidentiary hearing regarding this issue:

Q [by Petitioner's post-conviction counsel].  And is it true that one of the things you have alleged in your motion is that DNA test that was conducted or that we received and did further testing on calls into question whether or not the alleged victim is, in fact, a biological relative?

A.  Yes.

Q.  Beyond the DNA test, is there another reason that you have to question whether or not the alleged victim in this case is a biological relative?

A.  Yes.  There is another sister that is not the actual sister [the "Danielle" who Petitioner referenced in his testimony at the pre-trial bond hearing].  It was found out about 23, 24 years later.

Q.  Slow down just a little bit.  So you said another sister.  So let's go through that slowly.  Who are you talking about?

A.  The victim's sister.

Q.  The alleged victim's sister and that is the daughter of your brother; is that correct?

A.  No, she's not the daughter of my brother.  She was proved not to be the daughter of my brother.

Q.  Was there a time that your brother believed that this particular person was, in fact, the daughter?

A .  The whole time until I took his life, yeah.

Q.  And then after that, it is knowledge within the family that this particular person in question found out that your brother was not her biological father; is that correct?

A.  Yes.

Q.  In fact, did she find out who her biological father is?

A.  Yes, she did.  She actually went on the Internet and started searching and somehow she ran across the person that was in California I believe that said she knew her mother, that he met her at a bar one night and they went out and that is how that came about.  And they finally met together with the person, she met with the person and took the DNA test and turned out to be that it was her father.

Q.  So you do have a good faith basis in your own mind to believe that the alleged victim in this case may not be biologically related to you; is that correct?

A.  Yes.  I have a friend of mine, a very good friend of mine like I consider him like a brother, used to hang out together, we had a club and we spend a lot of time at the club and the [victim's] mother used to hang out at the club and therefore, also had intercourse well, she was with my brother.

Q.  Rather than get into the specifics, you have a good faith basis and if this case proceeds to trial, is that something you would want to present?

    A.  Definitely, yes.

(Ex. G at 264–66).  Petitioner's counsel argued at the evidentiary hearing, ". . . that's the basis for Claim 1 of our 3.850 motion is that he had said all along that I don't believe that she's an actual, biological relation, . . ." (Ex. F at 186).

      There appears to be no dispute that DNA testing by the State showed that there was over an 81% probability that Petitioner and the victim were related as uncle and niece (*see* Ex. F at 189–90, Ex. G at 298).  Though Petitioner was apparently unaware of the results of the State's DNA testing when he entered his plea, he knew at the plea hearing that the factual basis for the incest charges was that he "[had] sexual intercourse with his niece by blood on three occasions listed in the information" (Ex. C at 301).  Petitioner also knew that he had doubts about whether the victim was his biological niece, as indicated by his statements at the pre-trial bond hearing.  And Petitioner knew that the court had previously ordered him to provide a buccal swab for DNA testing (at a pre-trial hearing on June 16, 2010, at which Petitioner was present, the court ordered Petitioner to provide a buccal swab) (*see* Ex. A at 151; Ex. PD-1, docket entries for pre-trial hearing on 6/16/2010).  Petitioner entered his plea knowing that there was a possibility he was not biologically related to the victim, and that DNA testing had been performed or could be performed.

Turning to the circumstances facing Attorney Barnes at the time the plea offer was made, a jury had been selected for Petitioner's trial on the three sexual battery counts (second degree felonies, each of which carried a maximum penalty of 15 years in prison, for a total of 45 years), and the three incest counts (third degree felonies, each of which carried a maximum penalty of 5 years in prison, for a total of 15 years). Attorney Barnes had reasonably focused his investigation on the sexual battery counts, which carried greater penalties, and he reasonably chose to pursue a consent theory of defense.  Pursuing a consent theory also benefitted Petitioner's position with respect to the incest charges—it provided a basis for limiting Petitioner's sentence exposure on those charges.  Attorney Barnes' pre-trial investigation eventually revealed communications between the victim and Petitioner which suggested that the sexual relationship was consensual, and this convinced the State to offer to drop the sexual battery charges in exchange for Petitioner's plea to the incest charges.  Given the timing and circumstances of the State's plea offer, and the potential for a dramatic reduction of Petitioner's sentence exposure on the incest charges based upon the newly discovered evidence, it was not unreasonable for Attorney Barnes to advise Petitioner to accept the State's plea offer even though Barnes had not fully investigated the issue of whether Petitioner and the victim were biologically related.

And even if Attorney Barnes had investigated the issue by hiring an independent analyst, it would have still yielded the result that the DNA data was consistent with a biological relationship of uncle and niece, just with a 5% less probability at most.

It is possible that fairminded jurists could disagree on the correctness of the state court's conclusion that Attorney Barnes was not ineffective for failing to obtain independent DNA analysis and discuss the possible DNA defense with Petitioner prior to advising him to enter the no contest plea; however, it is this potential for disagreement which precludes this court from granting habeas relief on this claim. *See* Harrington, 562 U.S. at 786 ("A state court's determination that a claim lacks merit precludes habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."); *id.* (§ 2254(d) preserves the federal court's authority to issue the writ in cases where "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents); *see also* Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1127 (11th Cir. 2012) (if, at a minimum, fairminded jurists could disagree about the correctness of the state court's decision, the state court's application of Supreme Court precedent was not unreasonable, and AEDPA precludes the grant of habeas relief) (citing Harrington,

*supra*); <u>Johnson v. Sec'y, Dep't of Corr.</u>, 643 F.3d 907, 910 (11th Cir. 2011) (". . . only 'if there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents' may relief be granted.") (quoting <u>Harrington</u>, *supra* ).

Petitioner failed to demonstrate that the state court's adjudication of Ground Two was based upon an unreasonable determination of the facts, or that it was contrary to or an unreasonable application of <u>Strickland</u>.  Therefore, Petitioner is not entitled to an evidentiary hearing on Ground Two, nor is he entitled to federal habeas relief.

C.    <u>Ground Three:  "The cumulative effect of defense counsel's errors deprived Petitioner Napolitano of a fair proceeding."</u>

Petitioner claims that both alleged errors by Attorney Barnes set forth *supra* in Grounds One and Two, considered either individually or together, denied him a fair proceeding (ECF No. 1 at 19–20).

Respondent contends Petitioner has failed to state a claim upon which relief can be granted, because this claim is conclusory, and a claim of "cumulative effect" has not been recognized by the Supreme Court (ECF No. 10 at 21–24).  Respondent alternatively argues that because there was no deficient performance by trial counsel

and no prejudice from any such performance, there is nothing to accumulate into a separate claim of ineffectiveness.

Petitioner raised a claim of "cumulative error" as Ground 3 of his Rule 3.850 motion (Ex. F at 97).  The state circuit court determined that because there was no error with respect to either of Petitioner's IAC claims, his "cumulative error" claim was also without merit (Ex. G at 342).  Petitioner argued this "cumulative error" issue on appeal to the First DCA (Ex. I at 21).  The First DCA affirmed the lower court's decision (Ex. L).

In rejecting a similar "cumulative error" argument made by a § 2254 habeas petitioner, the Eleventh Circuit stated:  "The Supreme Court has not directly addressed the applicability of the cumulative error doctrine in the context of an ineffective assistance of counsel claim."  Forrest v. Fla. Dep't of Corr., 342 F. App'x 560, 564 (11th Cir. 2009) (per curiam) (unpublished but recognized for persuasive authority).  The Forrest panel further noted "[h]owever, the Supreme Court has held, in the context of an ineffective assistance claim, that 'there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt.'"  *Id.* at 564–65 (quoting

United States v. Cronic, 466 U.S. 648, 659 n.26, 104 S. Ct. 2039, 80 L. Ed. 2d 657

(1984)).

In light of Cronic and the absence of Supreme Court precedent applying the

"cumulative error" doctrine to claims of ineffective assistance of counsel, the state

court's rejection of Petitioner's claim is not contrary to or an unreasonable application

of clearly established federal law.  See Woods v. Donald, — U.S. —, 135 S. Ct. 1372,

1377, 191 L. Ed. 2d 464 (2015) (holding, as to claim that counsel was per se

ineffective in being absent from the courtroom for ten minutes during testimony

concerning other defendants:  "Because none of our cases confront the specific

question presented by this case, the state court's decision could not be contrary to any

holding from this Court." (internal quotation marks and citation omitted)); Wright v.

Van Patten, 552 U.S. 120, 126, 128 S. Ct. 743, 169 L. Ed. 2d 583 (2008) ("Because

our cases give no clear answer to the question presented, let alone one in [the

petitioner's] favor, it cannot be said that the state court unreasonably applied clearly

established federal law."); Schriro v. Landrigan, 550 U.S. 465, 478, 127 S. Ct. 1933,

167 L. Ed. 2d 836 (2007) (Arizona Supreme Court did not unreasonably apply federal

law because "we have never addressed a situation like this"); Reese v. Sec'y, Fla.

Dep't of Corr., 675 F.3d 1277, 1287–88 (11th Cir. 2012) ("The Supreme Court has

reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law."); *see also* Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1132 (11th Cir. 2012) (refusing to decide whether, under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law).

In any event, cumulative effect analysis should evaluate only matters determined to be in error, not the cumulative effect of non-errors. *See* United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004) (where no individual errors have been demonstrated, no cumulative errors can exist); *see also* Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Mullen cites no authority in support of his assertion, which, if adopted, would encourage habeas petitioners to multiply claims endlessly in the hope that, by advancing a sufficient number of claims, they could obtain relief even if none of these had any merit. We receive enough meritless habeas claims as it is; we decline to adopt a rule that would have the effect of soliciting more and has nothing else to recommend it. Twenty times zero equals zero."); United

States v. Hall, 455 F.3d 508, 520 (5th Cir. 2006); Mancuso v. Olivarez, 292 F.3d 939,

957 (9th Cir. 2002) (where there is no single constitutional error, nothing can

accumulate to the level of a constitutional violation); United States v. Hardy, 224 F.3d

752, 757 (8th Cir. 2000); Fisher v. Angelone, 163 F.3d 835, 852 (4th Cir. 1998) ("To

the extent this Court has not specifically stated that ineffective assistance of counsel

claims . . . must be reviewed individually, rather than collectively, we do so now.");

Moore v. Reynolds, 153 F.3d 1086, 1113 (10th Cir. 1998).

As previously discussed, Petitioner has not shown error of a constitutional

dimension with respect to either of the IAC claims presented in Grounds One and Two

*supra*.  Therefore, nothing can accumulate to the level of a constitutional violation.

Accordingly, Petitioner is not entitled to federal habeas relief on Ground Three.

## IV.   CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States

District Courts provides that "[t]he district court must issue or deny a certificate of

appealability when it enters a final order adverse to the applicant," and if a certificate

is issued "the court must state the specific issue or issues that satisfy the showing

required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed,

even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 21<u>st</u> day of November 2016.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.   If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.